**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NICHOLAS J. CIAVARELLA, JR., | ) | CASE NO. 5:13-CV-2031 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | VECCHIARELLI |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | | |

Plaintiff, Nicholas J. Ciavarella, Jr. ("Plaintiff"), challenges the final decision of Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying his applications for Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423. This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2). For the reasons set forth below, the Commissioner's final decision is REVERSED and REMANDED for proceedings consistent with this Opinion and Order.

## I. PROCEDURAL HISTORY

On July 9, 2010, Plaintiff filed his applications for POD and DIB, alleging a disability onset date of December 1, 2008. (Transcript ("Tr.") 10.) The claims were denied initially and upon reconsideration, and Plaintiff requested a hearing before an administrative law judge ("ALJ"). (*Id.*) On July 18, 2012, an ALJ held Plaintiff's hearing. (*Id.*) At the hearing, Plaintiff amended his alleged onset date to June 1, 2011. (*Id.*)

Plaintiff participated in the hearing, was represented by counsel, and testified. (*Id.*) A vocational expert ("VE") also participated and testified. (*Id.*) On August 6, 2012, the ALJ found Plaintiff not disabled. (Tr. 10-19.) On August 21, 2013, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 1.)

On September 13, 2013, Plaintiff filed his complaint challenging the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 15, 16, 17.) Plaintiff argues that substantial evidence does not support the ALJ's decision in this matter because: (1) the ALJ failed to articulate a basis for omitting a limitation suggested by his treating physician from Plaintiff's residual functional capacity ("RFC"); and (2) the ALJ improperly evaluated Step 4 of the sequential analysis. (Doc. No. 15.)

## II. EVIDENCE

### A. Personal and Vocational Evidence

Plaintiff was born in June 1961 and was 49 years old on the alleged disability onset date. (Tr. 143.) He had past relevant work as a marketing manager and webmaster. (Tr. 18.)

### B. Medical Evidence

#### 1. Medical Reports

The record reflects that Plaintiff underwent coronary bypass grafting ("CABG") in 1999. (Tr. 246.) Medical records reflect that the CABG "failed." (Tr. 299.) The report of an April 2003 stress test noted Plaintiff's complaints of chest pain, but revealed

normal blood pressure and heart rate response. (Tr. 232.) A July 2006 stress test revealed: abnormal myocardial perfusion after maximal exercise; a moderate area of inferolateral infarction, mostly inferior; a small amount of inferolateral ischemia; abnormal left ventricle function; and a below average exercise capacity for Plaintiff's age. (Tr. 247.) At the time, Plaintiff was 5 feet, 9 inches tall and weighed 332 pounds. (Tr. 246.)

In December 2006, Plaintiff's cardiologist, Kenneth E. Berkovitz, M.D., described Plaintiff as "stable from a cardiac standpoint without any angina or heart failure symptoms." (Tr. 245.) Dr. Berkovitz noted that he had "continued to recommend that [Plaintiff] strongly consider bariatric surgery" because Plaintiff was "not losing weight." (Tr. 245.) Dr. Berkovitz described Plaintiff's obesity as "a major medical comorbidity and should be treated like a malignancy." (*Id.*) Plaintiff indicated that he was not interested in pursuing the surgery. (*Id.*)

In February 2008, Plaintiff's primary care physician, Daniel Steidl, M.D., noted Plaintiff's past history of, *inter alias*, diabetes, elevated cholesterol, obesity, ischemic heart disease, CABG, hypertension and severe coronary artery disease. (Tr. 304.) In July 2008, Dr. Berkovitz noted Plaintiff's report that he was not experiencing any angina or heart failure symptoms. (Tr. 237.) Dr. Berkovitz diagnosed Plaintiff with stable coronary artery disease and obesity. (Tr. 238.) At that time, Plaintiff was "to undergo bariatric surgery." (*Id.*)

After a July 2009 sleep study, Hitesh Makkar, M.D., diagnosed Plaintiff with severe obstructive sleep apnea and obesity. (Tr. 283.) He recommended that Plaintiff receive a CPAP machine and lose weight. (*Id.*)

On October 29, 2009, Dr. Steidl noted Plaintiff's report that Plaintiff had gone to the emergency room two months prior, complaining of wheezing and shortness of breath.[1] (Tr. 277.) Plaintiff complained of wheezing. (*Id.*) In December 2009, Dr. Berkovitz observed that, although Plaintiff was doing well with no angina or heart failure symptoms, Plaintiff had dyspnea and severe exercise intolerance, "like due to his body habitus." (Tr. 235.) Plaintiff complained of numbness in his left leg when standing for long periods of time. (*Id.*) Dr. Berkovitz again recommended bariatric sugery, which he characterized as potentially life saving, but Plaintiff declined to consider it. (Tr. 236.) Dr. Berkovitz prescribed an albuterol inhaler. (Tr. 235.)

In February 2010, Plaintiff complained of shortness of breath to Dr. Steidl, who noted that the shortness of breath was improved with albuterol. (Tr. 273.) On April 12, 2010, Dr. Steidl noted Plaintiff's complaint of continued shortness of breath, requiring him to use an inhaler multiple times each day. (Tr. 270.) Dr. Steidl diagnosed Plaintiff with asthmatic bronchitis and prescribed prednisone, an antibiotic, and inhalers. (Tr. 271.) On April 27, 2010, Plaintiff complained of wheezing and shortness of breath, which had improved with asthma medications. (Tr. 266.) Dr. Steidl diagnosed Plaintiff with asthma, prescribed inhalers, and directed Plaintiff to undergo a pulmonary function test. (Tr. 267-68.) An April 30, 2010 pulmonary function test revealed function within normal limits. (Tr. 263.)

In July 2010, Plaintiff complained to Dr. Steidl of dizziness occurring when he bent over. (Tr. 259.) He continued to report shortness of breath. (*Id.*) Dr. Steidl

---

[1] The administrative transcript does not contain the records from Plaintiff's August 2009 emergency room visit.

continued Plaintiff on his asthma medications. In August 2010, Dr. Steidl diagnosed Plaintiff with cellulitis, and prescribed an antibiotic. (Tr. 255-56.) During a November 2010 appointment, Plaintiff complained to Dr. Steidl of increased numbness in his left leg after standing for long periods of time. (Tr. 338.)

Dr. Berkovitz examined Plaintiff in December 2010. (Tr. 326-27.) Plaintiff reported increased exertional chest discomfort, but again declined to consider bariatric surgery. (Tr. 326.) Dr. Berkovitz opined that Plaintiff's coronary artery disease was stable, and diagnosed him with morbid obesity. (Tr. 327.) He instructed Plaintiff to undergo a stress test. (*Id.*)

In January 2011, Joseph Rinaldi, M.D., conducted a stress test on Plaintiff, who weighed 361 pounds. (Tr. 336.) The test revealed borderline electrocardiographic changes for inducible ischemia. (Tr. 337.) Plaintiff complained of chest pain with exercise, and Dr. Rinaldi noted that Plaintiff had poor exercise capacity for his age. (*Id.*) Imaging scans of Plaintiff's heart performed at that time revealed an inferior wall scar, with some reversibility of the inferolateral wall, suggestive of peri-infarct ischemia. (Tr. 332.)

In May 2011, Plaintiff reported to Dr. Steidl that he was exercising by walking on a track, but had to stop every 15 to 20 minutes due to angina and pain in his back and legs. (Tr. 334.) He complained of numbness and tingling in his left leg. (*Id.*)

On December 1, 2011, Dr. Berkovitz noted that Plaintiff was doing well, with stable coronary artery disease and excellent blood pressure. (Tr. 345-46.) He observed that Plaintiff's activity level was limited by degenerative joint disease, although that diagnosis does not appear at any place in the administrative transcript. (Tr. 345.)

Plaintiff agreed to consider bariatric surgery when his "financial issues improve[d]," and Dr. Berkovitz counseled him to continue to work on losing weight. (Tr. 346.)

On December 20, 2011, Plaintiff reported to Dr. Steidl that he had no recent episodes of shortness of breath, and had no asthma symptoms while using the inhalers. (Tr. 368.) Dr. Steidl recommended that Plaintiff enroll in a bariatric surgery program that did not require insurance. (Tr. 369.)

On March 17, 2012, Plaintiff was admitted to a Summa hospital after complaining of an irregular heartbeat, an unusual sensation in his chest, and increased stuffiness in his nose, as well as cellulitis. (Tr. 348.) Plaintiff was admitted for observation. (Tr. 349.) While in the hospital, Plaintiff had no significant arrhythmia, and was afebrile. (Tr. 350-51.) Physicians prescribed an antibiotic. (Tr. 351.) Plaintiff was diagnosed with cellulitis, pretibial stasis dermatitis, venous insufficiency, stable coronary artery disease and diabetes. (Tr. 351.) He was discharged on March 18, 2012. (Tr. 350.)

On March 26, 2012, Dr. Steidl recommended that Plaintiff use a compression stocking on his left leg. (Tr. 367.) A March 26, 2012 image of Plaintiff's chest, taken at Akron City Hospital after Plaintiff complained of chest pain, revealed no acute cardiopulmonary disease. (Tr. 344.)

On June 21, 2012, Dr. Berkovitz completed a cardiac medical source statement. (Tr. 354-55.) He reported that Plaintiff's diagnoses were: coronary artery disease, class II; and angina, class II. (Tr. 354.) He noted that Plaintiff's symptoms were chest pain, anginal equivalent pain, exercise intolerance, peripheral edema, chronic fatigue and palpitations. (*Id.*) Dr. Berkovitz described Plaintiff's prognosis as "guarded - morbid

obesity." (*Id.*) He opined that Plaintiff was capable of low stress work, and would need to take an unscheduled break every two to three hours. (*Id.*) Dr. Berkovitz stated that Plaintiff could lift up to ten pounds, and could stand/walk for up to four hours (one to two hours uninterrupted) during a four-hour day. (Tr. 354-55.) According to Berkovitz, Plaintiff should avoid concentrated exposure to: extreme heat and cold, high humidity, wetness, cigarette smoke, perfumes, soldering fluxes, solvent/cleaners, fumes, odors, gases, dust and chemicals. (Tr. 355.) Dr. Berkovitz opined that Plaintiff would never be off task as a result of his symptoms, and that he would never be absent from work as a result of his impairments or treatment. (*Id.*)

**2. Agency Reports**

On November 4, 2010, agency consulting physician Gregory A. Moten, D.O., examined Plaintiff. (Tr. 314-18.) Plaintiff reported last working in December 2008, stating that he had stopped working due to his heart disease. (Tr. 315.) Dr. Moten noted Plaintiff's report of chest pain, shortness of breath and difficulty with physical activities. (*Id.*) He diagnosed Plaintiff with severe coronary artery disease. (*Id.*) Dr. Moten opined that Plaintiff would be capable of sedentary work. (Tr. 318.)

**C. Evidence from Plaintiff's Former Employer**

In an August 9, 2010 letter, Jackie Schulte, the human resources director of Plaintiff's former employer, reported that the company had laid Plaintiff and his immediate supervisor off in December 2008 "[d]ue to previous business conditions and poor projected sales forecast due to the economic climate." (Tr. 186.) She stated that Plaintiff had worked as a marketing manager. (*Id.*) In a work activity questionnaire,

Schulte reported that, while employed, Plaintiff had been able to: perform all of his job duties without special assistance, complete all the duties of his position, regularly report to work as scheduled, and complete the same amount of work as other employees in his position. (Tr. 187.)

## D. Hearing Testimony

### 1. Plaintiff's Hearing Testimony

At his July 18, 2012 administrative hearing, Plaintiff testified as follows:

He had open heart surgery on December 24, 1999. (Tr. 33.) In March 2000, he learned that four of the five grafts completed during the surgery were occluded. (Tr. 39-40.) Thereafter, his physicians had decided that a second surgery was not likely to be successful. (Tr. 40-41.) His physician had recommended bariatric surgery, but Plaintiff could not afford it. (Tr. 41-42.) Plaintiff was five feet, nine inches tall and weighed 361 pounds. (*Id.*) He lived alone. (Tr. 34.)

Plaintiff worked as an assistant high school girls basketball coach. (Tr. 35.) The position was "not your traditional coaching job," as Plaintiff was not "out there running around, throwing the ball, passing." (*Id.*) Rather, Plaintiff was "more of a consultant helping the head coach," by scouting other teams, reviewing film, and working with the players to develop their skills. (Tr. 35-36.) The players set up folding chairs for Plaintiff to use at various points in the gymnasium. (Tr. 36.) During the basketball season, Plaintiff worked two and one-half hours on game days, and one and one-half to two hours on other days, approximately three days each week. (*Id.*) Plaintiff received a stipend for his work with the basketball team. (Tr. 37.)

Plaintiff had a college degree in business and organizational communication. (Tr. 37.) He worked full time until December 2008, and, after collecting unemployment, lived off of his savings and with assistance from his family. (Tr. 37-38.) His employer, where he worked for 30 years, had let him go after trying to accommodate his health condition by altering his job. (Tr. 42.) Eventually, the company "released" Plaintiff because "it got to the point where I was missing a lot of days or I was trying to come in early, get the job done, you know, taking extended lunches, just because, you know, [I] just couldn't do it any anymore, couldn't maintain it." (Tr. 42-43.) Plaintiff "had to be there for people . . . had to answer phones," and eventually "start[ed] to make some mistakes" and "g[o]t to the point where I was, couldn't sustain a normal work week." (Tr. 43.) In the final year and one-half of working for his former employer, Plaintiff missed three or four days of work each week, and took work home but could not complete it. (*Id*.)

Plaintiff was not able to work because he experienced chest pains and pain in his legs. (Tr. 44.) He tired quickly and could not focus and concentrate. (*Id*.) Plaintiff was able to drive, but only for about a 20 minute span. (Tr. 50-51.) Plaintiff generally went to bed before midnight, and woke up between 7:30 or 8:00 in the morning. (Tr. 51-52.) If he was feeling "yucky," which happened once or twice each week, he would stay in bed until 10:30 or 11:00 in the morning. (Tr. 52.) He took a nap every day. (*Id*.) On a typical day, Plaintiff would spend time checking his e-mail messages, and looking in on his mother, who had early dementia. (Tr. 53-54.) He would have lunch with his mother and then go home and take a nap. (Tr. 54.) Plaintiff avoided going to church or to restaurants with his friends because "there's a lot of people that cough, you know, or

[are] sniffling, and I get, you know, sick real quick." (Tr. 57.)

Plaintiff could sit for 20 minutes to an hour before experiencing leg pain. (Tr. 57.) He could stand for 20 to 30 minutes before his leg went numb. (*Id.*) He could walk on a flat surface for the length of two basketball courts, or around 400 feet, without needing to sit down. (Tr. 58.) He could walk five minutes in an air-conditioned setting. (Tr. 59.) Plaintiff could lift ten pounds, but used to ask for help lifting and carrying a ream of paper at work. (*Id.*)

**2. Vocational Expert's Hearing Testimony**

The ALJ described the following hypothetical individual of Plaintiff's age, education, work experience and skill set:

> [A]ble to perform sedentary work as defined in the regulations. The person could never climb ladders, ropes or scaffolds and only occasionally climb ramps or stairs. . . . The person could occasionally stoop, crouch, kneel and crawl. The person would have to avoid concentrated exposure to extreme heat and cold and concentrated exposure to humidity. The person would have to avoid even moderate exposure to environmental irritants such as fumes, odors, dust, gases and moderate exposure to poorly ventilated areas. The person would also have to avoid all use of moving machinery and all exposure to unprotected heights.

(Tr. 70-71.) The VE opined that the hypothetical individual would be able to perform Plaintiff's past work. (Tr. 71.) In response to questioning by the ALJ, the VE opined that missing more than two work days per month would preclude competitive employment at any skill or exertional level. (Tr. 74-75.) Plaintiff's counsel asked whether the hypothetical individual would be able to perform Plaintiff's past work if, once or twice during the week, the individual was "more suited to unskilled work." (Tr.

75.) The VE opined that such a limitation would preclude work in Plaintiff's past relevant work because the past work was a skilled job. (*Id.*)

## III. STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) *and*

416.920(d). Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. Plaintiff meets the insured status requirements of the Act through March 31, 2014.

2. Plaintiff has not engaged in substantial gainful activity since June 1, 2011, the alleged onset date.

3. Plaintiff has the severe impairments of obesity; coronary artery disease, status post-coronary artery bypass grafting; diabetes mellitus; and chronic venous insufficiency of the lower left extremity.

4. Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. Plaintiff has the RFC to perform sedentary work as defined in 20 C.F.R. 404.1567(a) except that he can never climb ladders, ropes or scaffolds, and can occasionally climb ramps and stairs. Plaintiff can occasionally stoop, kneel, crouch and crawl. He must avoid concentrated exposure to extreme heat, cold and humidity. He must avoid even moderate exposure to environmental irritants, such as fumes, odors, dusts and gases, and poorly ventilated areas. Plaintiff must avoid all use of moving machinery and all exposure to unprotected heights.

6. Plaintiff is capable of performing his past relevant work as a marketing manager. This work does not require the performance of work-related activities precluded by Plaintiff's RFC.

7. Plaintiff has not been under a disability, as defined in the Act, from

June 1, 2011, through August 6, 2012, the date of this decision.

(Tr. 12-19.)

## V. LAW & ANALYSIS

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

**B. Plaintiff's Assignment of Error**

Plaintiff argues that substantial evidence does not support the ALJ's decision in this case because the ALJ: (1) failed to either include a limitation to low stress jobs in Plaintiff's RFC, or explain that omission; and (2) erred at Step Four of the sequential analysis by failing to make a finding regarding the stress level of Plaintiff's prior work. These arguments are well taken.

**1. Dr. Berkovitz's Opinion**

In his June 2012 medical source statement, Dr. Berkovitz opined, *inter alias*, that Plaintiff was "capable of low stress work." (Tr. 354.) In his decision, the ALJ noted Dr. Berkovitz's opinion regarding Plaintiff's limitations, and specifically mentioned that Dr. Berkovitz had concluded that Plaintiff could tolerate low stress work. (Tr. 15.) The ALJ assigned Dr. Berkovitz's opinion great weight. (Tr. 15-16.) The ALJ did not, however, include any limitation to low stress work in his determination of Plaintiff's RFC. (Tr. 13.)

It is well established that, where the opinion of a medical source contradicts his RFC finding, an ALJ must explain why he did not include its limitations in his determination of a claimant's RFC. *See, e.g., Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) (Lioi, J.) ("In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."). Social Security Ruling 96-8p provides, "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the

opinion was not adopted." SSR 96-8p, 1996 WL 374184, *7 (July 2, 1996).

Here, Plaintiff argues that the ALJ's omission of a limitation to low stress jobs contradicted Dr. Berkovitz's opinion that Plaintiff was capable of low stress work, and that the ALJ erred in failing to explain this omission. Review of the ALJ's decision bears this out. Dr. Berkovitz opined that Plaintiff could only tolerate jobs at a certain stress level. This contradicts the ALJ's determination of Plaintiff's RFC, which does not include any stress-related limitations. The ALJ's omission of this low-stress limitation, without any explanation, makes it impossible for this Court to determine whether substantial evidence supports the RFC.

The Commissioner challenges the reliability of Dr. Berkovitz's opinion by noting that Dr. Berkovitz did not provide any explanation for his conclusion that Plaintiff could tolerate only low stress jobs. Review of the ALJ's decision, however, reveals that the ALJ did not discuss the reliability of Dr. Berkovitz's opinion regarding Plaintiff's ability to tolerate stress. Accordingly, the Commissioner's argument fails because it constitutes impermissible post-hoc rationalization. *See* *Berryhill v. Shalala*, 4 F.3d 993, *6 (6th Cir. Sept. 16, 1993) (unpublished opinion) ("[T]he courts may not accept appellate counsel's *post hoc* rationalizations for agency action. It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." ) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983))(citation omitted). The ALJ's failure either to include Dr. Berkovitz's low-stress limitation in the RFC finding or to explain its omission merits remand in this case.

**2. Step Four**

Plaintiff also argues that the ALJ erred in failing, at Step Four, to make a determination regarding the level of stress he experienced at his former job. According to Plaintiff, because his treating physician opined that Plaintiff could tolerate only low stress jobs, the ALJ erred in concluding that Plaintiff could perform his prior work without first determining the level of stress that work involved. This argument has merit, particularly given the ALJ's failure to explain the omission of the low-stress limitation from Plaintiff's RFC. Given Dr. Berkovitz's opinion that Plaintiff could tolerate only low stress jobs, the ALJ's failure to discuss the stress level of Plaintiff's former work makes it impossible for this Court to determine whether substantial evidence supports the ALJ's conclusion that Plaintiff could perform that work.

The Commissioner argues that, for various reasons, Plaintiff failed to demonstrate that his former job was sufficiently stressful that a low-stress limitation would have precluded him from performing it. Generally, it is the claimant's burden to prove the existence and severity of his limitations through Step Four of the sequential analysis, including "the fact that [he] is precluded from performing [his] past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). In this case, however, the ALJ entirely failed to consider whether Plaintiff had carried his burden of proving that his former work was more stressful than Plaintiff's RFC would permit. In other words, the ALJ did not make any finding with respect to whether Plaintiff satisfied his burden of proof on this issue. Absent some analysis of this issue, this Court cannot adequately review the ALJ's opinion and cannto determine whether substantial evidence supports the ALJ's conclusion. Thus, this argument merits remand in this

case.

## VI. CONCLUSION

For the foregoing reasons, the Commissioner's final decision is REVERSED and REMANDED. On remand, the ALJ shall: (1) consider Dr. Berkovitz's opinion that Plaintiff is capable of tolerating only low stress jobs, and either include that limitation in the Plaintiff's RFC or explain its omission from Plaintiff's RFC; and (2) if the ALJ incorporates Dr. Berkovitz's low stress limitation into Plaintiff's RFC, make a finding regarding the stress level of Plaintiff's former work and determine whether Plaintiff is capable of performing that work or other work that is available in the national economy.

**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: October 31, 2014